IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 18, 2002

## RICHARD D. SYKES v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**Nos. 2000-A-167, 2000-A-184, 2000-A-587     Cheryl Blackburn, Judge**

---

**No. M2001-03115-CCA-R3-PC - Filed January 15, 2003**

---

In July 2000, pursuant to a plea agreement, the Petitioner pled guilty to eight felonies: one count of aggravated kidnapping, four counts of aggravated robbery, one count of attempted especially aggravated robbery, one count of attempted first degree murder, and one count of aggravated assault. The trial court sentenced him pursuant to the agreement to an effective sentence of twenty years with a release eligibility percentage of 30% and a concurrent sentence of twelve years with a release eligibility percentage of 100%. The Petitioner subsequently filed a petition for post-conviction relief, and following a hearing on the petition, the trial court denied relief. This appeal ensued. The Petitioner argues on appeal that he received ineffective assistance of counsel when he entered his pleas and that his pleas were thus not entered knowingly or voluntarily. Having reviewed the record, we conclude that the Petitioner was not denied his right to effective representation at the time that he entered his pleas, and we conclude that the Petitioner entered his pleas knowingly, voluntarily, and intelligently. We therefore affirm the trial court's denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, and JAMES CURWOOD WITT, JR., JJ., joined.

David Martin Hopkins, Nashville, Tennessee, for the appellee, Richard D. Sykes.

Paul G. Summers, Attorney General and Reporter; Christine M. Lapps, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In January 2000, the Davidson County Grand Jury indicted the Petitioner, Richard D. Sykes, for conspiracy to commit especially aggravated kidnapping; especially aggravated kidnapping; and three counts of aggravated robbery. In February 2000, the Petitioner was indicted for conspiracy to commit aggravated robbery, attempted especially aggravated robbery, and attempted first degree

murder. Finally, in March 2000, the Petitioner was indicted for aggravated robbery and aggravated assault.

In July 2000, pursuant to a plea agreement, the Petitioner pled guilty to eight felonies, and the State dismissed all remaining counts. With regard to the first indictment, the Petitioner pled guilty to one count of aggravated kidnapping, for which he received a sentence of twelve years with a release eligibility of 100%; and three counts of aggravated robbery, for which he received sentences of ten years with a release eligibility percentage of 30%. With regard to the second indictment, the Petitioner pled guilty to one count of attempted especially aggravated robbery, for which he received a sentence of ten years with a release eligibility percentage of 30%; and one count of attempted first degree murder, for which he received a sentence of twenty years with a release eligibility percentage of 30%. With regard to the third indictment, the Petitioner pled guilty to aggravated robbery, for which he received a sentence of ten years with a release eligibility percentage of 30%; and aggravated assault, for which he received a sentence of six years with a release eligibility percentage of 30%. Pursuant to the plea agreement, all sentences were to be served concurrently. The resulting effective sentence was thus twenty years at 30% and twelve years at 100%, to be served concurrently.

In May 2001, the Petitioner filed a pro se petition for post-conviction relief. Following appointment of counsel, the Petitioner then filed an amended petition for post-conviction relief. On September 26, 2001, the trial court conducted a hearing on the petition, and, by order dated December 5, 2001, denied post-conviction relief. The Petitioner now appeals the denial of post-conviction relief, arguing that his pleas were not entered knowingly and voluntarily due to the ineffective assistance of counsel. Specifically, he argues that his attorney was ineffective for failing to adequately consult with him and advise him of the consequences of his pleas; for failing to adequately investigate the case; and for inducing him to plead guilty. Having carefully reviewed the record, we conclude that the Petitioner was not denied his right to the effective assistance of counsel and that he entered his pleas knowingly, voluntarily, and intelligently.

I. FACTS

The facts underlying the Petitioner's convictions were summarized as follows by the State at the plea proceeding:[1]

> The evidence . . . would show that on October 21, 1999, [the Petitioner and his two co-defendants] picked up a Mr. James Palmer. He went with them to Hadley's Park. There at Hadley's Park, the Defendants produced weapons and robbed Mr. Palmer of about $25 of what he had. Then they kept Mr. Palmer confined to the automobile and took him to El Dorado Motel, where he worked. . . . [S]ome of the suspects went to the door of the hotel, knocked on the door, and indicated that an old man, Mr. Palmer, was sick and could they come and get him. When the clerk of the hotel, Mr. Reed, came out, the Defendants pulled out weapons and robbed Mr. Reed of money, and, also, another person who was there, Mr. Olty, of money.

---

[1] The Petitioner conceded that the State's summary of the facts was "basically true."

At that point, I think Mr. Palmer managed to escape. [The male co-defendant] was the first suspect caught and admitted to the robbery. He also admitted that [the Petitioner and the female co-defendant] had been the people with him. Photo line-ups were put together, and the individuals identified both [the Petitioner and female co-defendant] as being the other man and the woman involved in these robberies and this kidnapping of Mr. Palmer.

. . . [T]he State would [further] prove that on October 20, 1999, at the Smart Shop at 818 South Fifth Street here in Davidson County, two males and one female, who were later identified as [the Petitioner and his co-defendants], came into the store and robbed the cashier . . . of money, perfume, cigarettes, and they used . . . what appeared to be handguns . . . to accomplish that.

Again, . . . when [the male co-defendant] was caught, [he] said [the Petitioner and the female co-defendant] were with him. Photo line-ups were put together, and there were identifications made of both [the Petitioner and the female co-defendant].

The other case . . . just involves [the Petitioner and the male co-defendant]. . . . [I]f that had gone to trial, the proof would have been that on November . . . 15, 1999, [the Petitioner and his co-defendant] went into the Mapco store at 4500 Charlotte Pike and attempted to rob the clerk, Mr. William Fry.[2] They had a handgun. Mr. Fry refused to give them the money. During the course of that, one of the Defendants shot Mr. Fry. Mr. Fry managed to call the police. All of this was captured on videotape, and the Defendants were clearly identifiable on the tape. And [the Petitioner] eventually admitted his involvement in this robbery or attempted robbery.

The following evidence was presented at the hearing on the petition for post-conviction relief: The Petitioner testified that he had completed seventh grade and that he had later earned his G.E.D. Although he admitted that he "did like a month-and-a-half at the CCA in Nashville in '94," he maintained that he knew nothing about the law before entering his pleas in this case. The Petitioner complained that his attorney did not adequately investigate the facts of his case, that he entered his guilty pleas in July 2000 without a full knowledge of the State's evidence against him, and that he felt that overall, he had received inadequate representation. He stated that had he received adequate representation, he would not have entered guilty pleas to the crimes with which he was charged in this case. The Petitioner also complained that his attorney never discussed with him the possibility of entering a "best interest plea."

The Petitioner stated that he met with his appointed counsel three times prior to entering his guilty pleas and for half an hour or less on the day of the plea proceeding. He claimed that when he entered his pleas, his counsel led him to believe that "the worst case scenario if [he] went to trial"

---

[2] We note that this victim's name is spelled differently throughout the record. In the transcript of the plea proceeding, it is spelled "William Fry"; in the transcript of the post-conviction hearing, it is spelled "William Frye"; and in medical records entered as exhibits at the post-conviction hearing, it is spelled "William Frey." For the purpose of this opinion, we will adopt the spelling used in the transcript of the post-conviction hearing.

would result in a ten-year sentence with a release eligibility percentage of 30%. The Petitioner stated that on the day of the plea proceeding, he expected to plead to this sentence, but when his attorney went to "go check" on the offer, the attorney returned with an offer of twelve years. The Petitioner testified, "I said, what happened to the 10? And [counsel] said, well, I don't know, . . . and then he went back out there for a few minutes and came back and he said, now they are offering you 20." The Petitioner maintained that he refused this offer, and counsel again walked out of the room. The Petitioner reported that when counsel returned, he said, "[T]hey are offering the 12 for a few minutes, only for a few minutes if you take it." He claimed that he thus felt rushed into pleading guilty.

The Petitioner stated that he accepted the offer, but claimed that he did so for two reasons: He stated that his attorney told him that the victim of the attempted first degree murder charge, William Frye, who had been shot during one of the robberies, "was going to die any day," and he feared that he could face a felony murder charge, resulting in a possible sentence of twenty-five years to life, if the victim died. He complained that counsel did not speak to Frye and that counsel did not share with him any medical reports concerning Frye, although he continually asked to see such reports. In addition, the Petitioner reported that his attorney "used the threat of [the Defendant's] kids" by asking the Petitioner: "[W]ouldn't you like to see your kids again before they are older than you are except behind a visiting glass window of the penitentiary?"

The Petitioner testified that he reviewed the State's discovery with his attorney, and he recalled that he watched the videotape of the incident involving William Frye. He stated that on the tape, Frye "never seemed like he was hurt or shot." He maintained that he "never knew [Frye] was shot until [he saw] it on the news."

The Petitioner stated that his attorney never told him that he would be required to serve his full twelve-year sentence, but instead told him that he would "get good time." He testified that based on this information and information that he received from other inmates in his holding cell, he believed at the time of his plea that he would be required to serve only six or seven years of the twelve-year sentence. He explained,

> [The other inmates] told me . . . once you get your points down to minimum security, you will be getting 16 days a month, . . . and so if . . . you do one year, they give you half a year, and if you do two, they give you one, so I was thinking 12 years, and [counsel] told me I was going to have to do like ten of it, . . . so I thought if I do six and they give me three, that is nine, and I would only have a year and a couple months left, so that is what I based six or seven years on.

The Petitioner maintained that if he had known that he would be required to serve his twelve-year sentence day-for-day, he would not have pled guilty to the charge.

The Petitioner testified that he did not hear the trial judge tell him at the time of his plea that his total effective sentence was twenty years with a release eligibility percentage of 30% because he "was half-way out the door" when the court informed him of this. He testified, "I looked at [counsel]

and asked him what was that? And he said, don't worry about it, that's nothing, and then they pushed me on out."

The Petitioner further testified that when he was asked at the plea proceeding whether the State's statement of facts was true, he turned to his attorney and said, "I thought you said I didn't have to say this," and his attorney responded, "[D]on't worry about it." He claimed that he was "confused" and "scared" and that he "didn't really understand" at the time he entered his plea. He also testified that his counsel told him "not to worry about reading" the plea petition, and he stated that he therefore did not read the petition as he initialed the document. He stated that the plea petition did not specify that he was to serve his twelve-year sentence day-for-day.

On cross-examination, the Petitioner admitted that he had previously been charged with aggravated rape, for which he ultimately received a sentence of "two at thirty on probation." He claimed, however, that he "signed [a] paper in the hallway" when he accepted his plea agreement in that case and that he never went into a courtroom to plead guilty to the charge. The Petitioner also claimed that when his probation was revoked, he did not enter the courtroom.

With regard to the charges stemming from the 1999 robbery of the Mapco store, the Petitioner testified that he never reviewed any discovery provided by the State with his attorney, except the videotape of the incident. He claimed that counsel told him that no fingerprints belonging to him were found at the Mapco where the crimes occurred. He also claimed that his attorney told him that the evidence against him consisted only of the videotape and a statement by his co-defendant. The Petitioner further claimed that counsel failed to provide him with any evidence as to the other crimes with which he was charged. In addition, the Petitioner maintained that he was not aware that he was facing a potential sentence of 128 years if convicted of all charges, with fifty of those years to be served at 100%. He stated, "All I knew was what [counsel] told me, . . . eight to twelve at 30%." Finally, the Petitioner testified that at the time of his representation, he believed that he and counsel had a good working relationship.

During the Petitioner's testimony, the State entered into evidence a letter, which the Petitioner admitted was written in his handwriting. The contents of the letter were as follows:

> I was a client of your's [sic] my name is Richard Sykes I don[']t know if you remember me or not but we went to co[u]rt on 7/13/00 and I plead to a 12 at 100% but they say here at Cockrill Bend that I[']m doing a 20 at 30% and that I[']ll have to do the 12 to[o] and my red date is 9/29/2011 and my exp. date is 9/23/2018 and that[']s not what you told me I was pleading to. To my understanding from you I was pleading to a 12 at 100% and I only had to do 85% of it and you told me the 12 would eat everything else up so when I finished the 12 I would be thru [sic] with it all so somethings [sic] wrong. So can you get back to me on this as soon as possible.

The Petitioner testified that he never received a response from counsel concerning the letter. In explaining the contents of the letter, the Petitioner admitted that he understood at the time of his plea that he was accepting a sentence of twelve years at 100%, but he explained that he believed he would

still be able to receive "good time" while incarcerated, thereby reducing the length of his sentence.

When the trial court pointed out that it had explained the release eligibility percentage for the twelve-year sentence to the Petitioner, the Petitioner responded, "I was sitting there, but I wasn't paying any attention." In addition, the Petitioner maintained that his attorney was "sitting behind him telling him what to say" during the plea proceedings. He further testified that his attorney told him that the plea petition was "just a piece of paper saying that he was my attorney, he represented me, and it was just so he could get paid." The Petitioner claimed that counsel told him the plea agreement "didn't mean anything."

The Petitioner's attorney testified that he had been licensed to practice law in Tennessee for five years at the time of the post-conviction hearing, and he stated that he had handled "predominantly criminal defense work" during those five years. Counsel testified that he was also a retired Nashville police officer and that he had worked in that capacity for eighteen years prior to becoming a lawyer.

Counsel testified that upon his appointment to represent the Petitioner, he requested discovery from the State and received three separate packages containing discovery information, one for each case against the Petitioner, as well as some supplemental discovery materials. Counsel reported that the materials he received included the medical records of William Frye, which indicated that Frye had suffered a gunshot wound to his abdomen. Counsel testified that he discussed the discovery materials, which included a fingerprint report, with the Petitioner on several occasions. Counsel stated that he also performed his own investigation of the case. He recalled that he located and spoke to witnesses to the crimes and to a victim of one of the crimes, who described the assailants. Counsel stated that he discussed the evidence he obtained through his investigation with the Petitioner.

Counsel reported that he met with the Petitioner eight times for a total of almost seven hours during the course of his representation of the Petitioner. He stated that he and the Petitioner discussed "in great detail" the status of William Frye's health. Counsel stated, "I had verified myself through Mapco, Incorporated that Mr. Frye had not been able to return to work, that he was very ill, and I explained to [the Petitioner] the felony murder statute and how that might affect him." He also testified that although he performed his own investigation of the case, he was unable to speak to Frye because of Frye's illness.

Counsel testified that he had calculated the Petitioner's maximum potential exposure, should he be convicted of all crimes and should the sentences run consecutively, and had determined that the Petitioner's exposure was "somewhere in the neighborhood of 100 years." He stated that he negotiated with the State during each of the "numerous court appearances" made by the Petitioner during the case. He recalled that on one occasion, he received an offer of fifteen years to be served at 100% and an offer of twenty years to be served at 30%. He stated that he discussed these offers with the Petitioner. Counsel reported that in response, the Petitioner told him that if he could negotiate a twelve-year sentence with a release eligibility percentage of 100%, he would accept such

an offer. Counsel stated, "[The Petitioner's] feeling was that he would have to do that 12, and . . . as he indicated in his letter, it would eat up that 20 at 30. And I actually believe that he was probably accurate in his thinking."

Counsel maintained that he did not believe that there was any lack of understanding on the Petitioner's part regarding the twelve-year sentence with a release eligibility percentage of 100%. Counsel testified,

> [I]n filling out the plea petition, I told [the Petitioner] that it was at 100%, and typically, defendants have a sense that it is really not a 100%. It's 85%, and when I was presented with that information from him that it is actually 85%, I back away from telling a client how those sentences are calculated, but that they are at 100%.

He also stated, "I did my best to explain to [the Petitioner] that I could not calculate the sentence, and . . . it was my understanding that there were provisions that the sentence would actually be served at 85%, but that he needed to understand that it was a sentence to be served at 100%." Counsel stated that he spent fifty minutes reviewing the plea petition with the Petitioner and reported that on the day that the Petitioner pled guilty, he billed a total of 2.8 hours.

With regard to his professional relationship with the Petitioner, counsel stated, "I thought we had a good relationship, and as a matter of fact, we spent several hours together . . . viewing the videotapes . . . backwards and forwards and discussed all the evidence. . . . I never thought we had any problem communicating with one another, and there was never any animosity or any problems." Counsel denied instructing the Petitioner regarding what to say during the plea hearing, and he stated he believed that the Petitioner understood what he was doing when he entered his pleas.

Counsel stated although it was his usual practice to provide his clients with copies of discovery materials, he could not testify that he had actually given the Petitioner copies of all discovery materials in this case. He explained that the amount of discovery materials was "massive." However, he stated, "I would suggest that I went over discovery with [the Petitioner]." He also reported that his records indicated that he discussed with the Petitioner the indictments and the elements of the crimes with which the Petitioner was charged.

Counsel stated that he attempted to contact William Frye through his employer, "just out of courtesy to the victim," and that he also went to the Mapco where Frye worked on more than one occasion, but he reported that he was ultimately unable to contact Frye. He testified that at the time he discussed Frye's medical condition with the Petitioner, several months prior to the plea proceeding, Frye had not been able to return to work, Frye required "continual medical attention," and Frye had undergone more than one surgery. He reported that the victim's poor health was a result of "a serious gunshot wound to the abdomen." He also stated that during plea negotiations, he learned from the State that Frye's health "was not good."

Counsel testified that Shekita Martin, the Petitioner's fiancée, called his office occasionally to ask him to explain what was happening with the Petitioner's case. He stated that although he did

not respond in writing to the Petitioner's letter, he spoke with Martin on the telephone after receiving the letter. He recalled that he explained the situation to her.

## II. ANALYSIS

The Petitioner now contends that he received ineffective assistance of counsel at trial and that his guilty pleas were therefore not entered knowingly and voluntarily. Specifically, the Petitioner argues that his counsel failed to adequately consult with him and advise him of the consequences of his guilty pleas; failed to adequately investigate the facts of the cases; and induced him to plead guilty.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203. The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Id. § 40-30-210(f). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. Id.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

This standard also applies to claims arising out of the plea process. Hill v. Lockhart, 474 U.S. 52, 58 (1985). To satisfy the requirement of prejudice in a case involving a guilty plea, the petitioner must demonstrate a reasonable probability that, but for counsel's errors, he or she "would not have pleaded guilty and would have insisted on going to trial." Id. at 59.

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

In order to satisfy constitutional standards, a plea of guilt must be entered knowingly, voluntarily and intelligently. See Boykin v. Alabama, 395 U.S. 238, 243 (1969). This includes an intentional relinquishment or abandonment of known constitutional rights, including the right against compulsory self-incrimination, the right to confront witnesses, and the right to a trial by jury. Bates v. State, 973 S.W.2d 615, 624 (Tenn. Crim. App. 1997). "'The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Powers v. State, 942 S.W.2d 551, 556 (Tenn. Crim. App. 1996) (quoting North Carolina v. Alford, 400 U.S. 25, 31 (1970)). "When a competent petitioner knowingly and voluntarily chooses a lawful course of action or defense strategy, counsel is essentially bound by that decision." Zagorski v. State, 983 S.W.2d 654, 658-59 (Tenn. 1998).

In determining whether the petitioner's guilty pleas were knowing and voluntary, this Court must look at the totality of the circumstances. State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); Chamberlain v. State, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). In doing so, we may review any relevant evidence in the record, including the post-conviction proceedings. Turner, 919 S.W.2d at 353.

> [A] court charged with determining whether [the] pleas were "voluntary" and "intelligent" must look to various circumstantial factors, such as the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993).

The trial court in this case made extensive findings of fact in its written order denying post-conviction relief. With regard to the Petitioner's claim that he did not enter his pleas knowingly and voluntarily, the trial court found as follows:

> The Petitioner claims that he was denied effective assistance of counsel in that his legal counsel failed to inform him of the nature and consequences of his pleas. Specifically, the Petitioner alleges that his legal counsel did not inform him

that his twelve-year sentence as to Count Two (Aggravated Kidnapping) under case number 2000-A-167 was to be served "day-for-day," or at 100%. . . . [T]he Petitioner testified that he would not have pled guilty if he thought he would be required to serve his sentence "day-for-day."

The resulting effective sentence was actually twenty (20) years at 30% and twelve (12) years at 100%. Prior to entering the plea negotiation agreement, the Petitioner faced 128 years confinement with fifty (50) years at 100%.

This Court notes that, during the guilty plea proceedings, the Court advised the Petitioner as follows: ". . . on 2000-A-167, you are going to be pleading guilty on Count Two to aggravated kidnapping, receive a 12-year sentence at 100 percent." The Court also notes [counsel's] testimony at the evidentiary hearing in this matter. [Counsel] testified that he conducted plea negotiations with the State contemporaneous to the numerous court appearances when the Petitioners [sic] case was set on the docket for discussion. [Counsel] testified that on June 15, 2000, the State offered the Petitioner a sentence of fifteen (15) years at 30% and twenty (20) years at 30%. [Counsel] testified that when the Petitioner learned from . . . his co-defendant . . . that she was offered twelve (12) years at 100%, the Petitioner informed [counsel] that he would be willing to accept the same offer.

As to the allegations set forth in the present claim, the Court finds [counsel] to be more credible than the Petitioner.

(Footnote omitted.) In addition, the trial court noted that "legal counsel i[s] not required to use specifically the phrase 'day-for-day' when explaining the terms of the plea negotiation or sentencing agreement to his or her client." The court further noted: "[S]hould there have been any indication that the Petitioner did not understand the nature and consequences of the plea which he was entering, the Court would have disallowed the plea agreement. Such is not the case with the present plea."

With regard to the Petitioner's claim that counsel failed to fully investigate the facts of his cases, the trial court again found counsel's testimony to be more credible than that of the Petitioner. In doing so, it pointed out the following testimony by counsel:

[Counsel] testified that he received the fingerprint report from the investigation of the events upon which case number 2000-A-184 was based and discussed the nature and substance of the report with the Petitioner. [Counsel] testified that he advised the Petitioner as to the seriousness of the evidence contained in the State's case against him. [Counsel] testified that he went into great detail with the Petitioner regarding the status of the victim's health in a meeting with the Petitioner on March 30, 2000. [Counsel] testified that, at that meeting, he explained the Felony Murder statute to the Petitioner. [Counsel] testified that on June 15, 2000, he related to the Petitioner that he was unable to meet with the victim because of his illness, but that he *was* able to locate several witnesses - even a witness who was unknown to the State.

With regard to the Petitioner's claim that counsel failed to adequately consult with him prior to the plea hearing, the trial court accredited counsel's testimony that he met with the Petitioner on at least eight occasions for a total of seven hours, noting that counsel was required to keep a log of

the time spent and expenses incurred while working on the Petitioner's case. The trial court also accredited counsel's testimony that he spent approximately fifty minutes reviewing the plea petition with the Petitioner. Furthermore, the court noted that counsel's time sheets, which it had approved, indicated that counsel had spent a total of 2.8 hours with the Petitioner on the day of the plea hearing.

Finally, with regard to the Petitioner's claim that counsel induced him to enter guilty pleas, the trial court found that the Petitioner's testimony lacked credibility. The court stated,

> As to the Petitioner's claim that his guilty pleas were the result of threats made by Petitioner's legal counsel, the Court notes again that the Court is afforded the option of relying on its own memory of the day the guilty plea was entered. Specifically, should this Court have received any indication that Petitioner's legal counsel was "railroading" the defendant over his own free will, the Court would have disallowed the plea agreement. But, such is not the case in the present matter.

The evidence presented in this case does not preponderate against these factual findings made by the trial court. The Petitioner has failed to show that he was deprived of his right to "reasonably effective" assistance of counsel when he entered his pleas. Burns, 523 S.W.2d at 936. The record indicates that counsel spent a considerable amount of time investigating the three cases against the Petitioner, consulting with the Petitioner concerning the evidence, negotiating with the State, and advising the Petitioner regarding his pleas and the consequences of the pleas. Furthermore, it does not appear from the record that counsel coerced the Petitioner in any way into pleading guilty to the charges against him. As the trial court concluded,

> Not only was Petitioner's legal counsel adequate in its representation including, but not limited to, devoting adequate amounts of time and resources investigating the nature and evidence of the State's case against him, this Court notes that the Petitioner benefitted from a very favorable result due to the diligence of [counsel] in his case.

Furthermore, even assuming that the Petitioner's representation was in some way inadequate, we conclude that the Petitioner has failed to demonstrate a reasonable probability that, but for counsel's errors, he would not have entered his guilty pleas and would have insisted on proceeding to trial. See Hill, 474 U.S. at 58. As the trial court concluded,

> Not only were the services rendered by [counsel] within the range of professional competence expected of criminal defense attorneys such that the Petitioner could not satisfy the first prong of the *Strickland* test, the facts of this case are so overwhelming that, were the deficiencies in [counsel's] performance alleged by Petitioner to be the case, no adverse effect would have resulted.

For these reasons, we AFFIRM the trial court's denial of post-conviction relief.

_____
ROBERT W. WEDEMEYER, JUDGE